**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kevin R. Jones, | ) No. CV-09-2129-PHX-JAT |
| Plaintiff, | ) |
| | ) **ORDER** |
| vs. | ) |
| | ) |
| Bank of America, N.A., a foreign business corporation, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Pending before the Court is Plaintiff Kevin Jones's Amended Motion for Preliminary Injunction. Doc. #57. The Court has reviewed the parties' filings and, having held a hearing and taken evidence on June 18, 2010, now rules on the Motion. For the reasons that follow, the Motion is denied.

**I.     BACKGROUND**

**A.     Case History**

Plaintiff alleges the following facts in support of his claims. In June and July 2006, Plaintiff Kevin Jones took out two mortgage loans with Defendant Bank of America on his residence located in Phoenix, Arizona. Doc. #22, ¶¶7–8. The June loan, No. 6749515810, is referred to by the parties as Loan #1. *Id.* The July loan, No. 7200135403, is referred to as Loan #2. *Id.* Plaintiff enrolled in an optional Borrowers Protection Plan at the time he

entered into both loan agreements.[1]  *Id.* at ¶9.  The Borrowers Protection Plan on Loan #1 ("Plan"), provided that Defendant, in exchange for monthly premiums, would cover Plaintiff's monthly mortgage payments for 12 months in the event that Plaintiff became disabled, involuntarily unemployed, or deceased.  Doc. #60 at Exhibit C.

Plaintiff became unemployed on January 13, 2008 because his employer could not find enough work to retain him.  Doc. #57 at Exhibit 5.  On January 22, 2008, Plaintiff contacted Bank of America and made a claim for unemployment benefits under the Loan #1 Plan.  Doc. #60 at Exhibit D, p. 4.  On February 2, 2008, Plaintiff was in a car accident which caused him severe, permanent injury and disability.  Doc. #22 at ¶13.  As a result of his unemployment and disability, Plaintiff was unable to continue working and making his mortgage payments.  *Id.* at ¶¶14–16.  Plaintiff did, however, continue to make his premium payments and the Loan #1 Plan's unemployment benefits covered Plaintiff's mortgage payments until at least January 1, 2009.  *Id.* at ¶¶17, 23; Doc. #60, Exhibit D at 22.  Some time after January 2009, Plaintiff failed to make most of his monthly payments on Loan #1 and Loan #2.  Doc. #22 at ¶16.  Defendant originally scheduled a Trustee sale of Plaintiff's house for November 9, 2009 based on Plaintiff's failure to make payments on Loan #2, but that sale was cancelled.  Doc. #22 at 1.

Plaintiff filed his First Amended Complaint on November 16, 2009, alleging breach of contract and tort claims.  *Id.*  On December 14, 2009, Defendant moved to dismiss the tort claims pursuant to Fed. R. Civ. P. 12(b)(6).[2]  Doc. #39.  On June 1, 2010, this Court granted dismissal of Plaintiff's negligence claim.  Doc. #56 at 3.  The Court further dismissed Plaintiff's wrongful foreclosure claim without prejudice.  *Id.* at 5.  However, the Court denied dismissal as to the Bad Faith Breach of Contract, Negligent Infliction of Mental

---

[1]The Plan for Loan #1, which is at issue in this motion, appears in Doc. #60 at Exhibit C and was offered into evidence at the Preliminary Injunction hearing as Exhibit #23.  The first two pages of the Plan for Loan #2 appears in Doc. #57 at Exhibit 3 and they were offered into evidence at the hearing as Exhibit #35.

[2]Defendant did not move to dismiss Plaintiff's claim of breach of contract.  Doc. #39.

Anguish, and Intentional Infliction of Mental Anguish claims. *Id.* at 4-8.

Defendant scheduled a Trustee sale of Plaintiff's home for June 21, 2010 based on Plaintiff's failure to make payments on Loan #1. Doc. #57 at Exhibit 1. Plaintiff filed his First Amended Motion for Preliminary Injunction Concerning Loan #1 on June 1, 2010, seeking a preliminary injunction blocking the Trustee sale. *Id.*

### B.    The Borrowers' Protection Plan

For both of Plaintiff's home mortgage loans, Plaintiff opted to enroll in a Borrowers' Protection Plan ("Plan"). Doc. #22, ¶¶7-8. With regards to Loan #1, Plaintiff enrolled in a plan that insured against disability, unemployment and death. *See* Doc. #60 at Exhibit C. The terms of the Plan are laid out in a document called "Optional Borrowers Protection Plan Addendum" ("Addendum"). Doc. #60 at Exhibit C. The Addendum states on page one of nine:

> There are eligibility requirements, conditions, and exclusions that could prevent you from receiving benefits under Borrowers Protection Plan. You may find a complete explanation of eligibility requirements, conditions and exclusions in the following portions of the Borrowers Protection Plan Addendum. . . The undersigned Borrowers acknowledge the receipt of the above product disclosures.

Doc. #60 at Exhibit C. The Addendum further states on page two of nine, "After reviewing the above information about Borrowers Protection Plan, having full opportunity to read the Addendum and ask questions, I/we make the following choice. . ." *Id.* Plaintiff signed page one and page two. *Id.* These pages are both labeled "Page [X] of 9." *Id.* Plaintiff's attorney claims his client received only these two pages when he enrolled in the Plan; however, there is no admissible evidence to support this claim. *Id.* at 9.

The Plan contains a cap on the number of months Defendant will cover policyholders' loan payments. On page two, the Addendum indicates that Plaintiff selected, "12 MONTH SINGLE DISABILITY, INVOLUNTARY UNEMPLOYMENT, ACCIDENTAL DEATH." *Id.* On page five, the Addendum states that the bank, "will cancel up to a maximum of six (6) or twelve (12) Monthly Payments" for a disability. *Id.* (emphasis original). Similarly, page seven of nine states that the bank, "will cancel up to a maximum of six (6) or twelve

1    (12) Monthly Payments" for involuntary unemployment.  *Id.* (emphasis original).

2         The Plan also contains a clause terminating coverage ten years, or 120 months, after

3    enrollment.  On page one, the Plan states, "The [Plan] will automatically terminate in the

4    following circumstances:. . . The expiration date (final scheduled payment due date) of your

5    loan is reached, or 120 months of protection, whichever comes first."  Doc. #60 at Exhibit

6    C.  On page two, the Plan reads, "protection will expire on July 1, 2016."  *Id.*  This is 120

7    months after June 15, 2006, the date that Plaintiff enrolled in the Plan.  *See id.*

8         The Plan contains requirements ("eligibility requirements") for collecting disability

9    and unemployment insurance.  On page four of nine, under the heading "DISABILITY

10   PROTECTION," the Addendum states:

11
        WHO IS ELIGIBLE FOR DISABILITY PROTECTION?  To be eligible for
12      disability protection, I must have worked at least thirty (30) hours per week,
        for wages or profit, on a continuous basis during the three-month period
13      immediately preceding the date of my Disability.  If I retire or become
        unemployed after the Note Date, I will no longer be eligible for Disability
14      Protection.  I have the right to cancel the Protection at any time.

15   Doc. #60 at Exhibit 3, p. 4.  There is no signature line on page four of the Addendum and

16   Plaintiff did not sign page four.  *Id.*  On page six of nine, under the heading, "WHEN WILL

17   MY INVOLUNTARY UNEMPLOYMENT NOT BE COVERED," the Addendum states,

18   "[if my unemployment] is due to disability caused by accident, sickness, disease. . ."  *Id.* at

19   p. 6.  There is no signature line on page six of the Addendum and Plaintiff did not sign page

20   six.  *Id.*  The Addendum defines "involuntary unemployment" as "1. Layoff - a suspension

21   of employment by my employer, which continues for more than thirty (30) days.  2.

22   Termination by My Employer - a complete and permanent severance of employment by my

23   employer. . ."  *Id.* at p. 5.  Each page of the Addendum is labeled "Page [X] of 9," although

24   the size and font of the numbering, as well as the footer, are different on pages one and two

25   than the rest of the document.  *Id.* at Exhibit 3.

     **II.    LEGAL STANDARD FOR PRELIMINARY INJUNCTION**

26        To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood

27   of success on the merits; (2) a likelihood of irreparable harm to the moving party in the

28

absence of preliminary relief; (3) a balance of equities tips in the favor of the moving party; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, --- U.S. ----, 129 S.Ct. 365, 376 (2008). Traditionally, injunctive relief was also appropriate under an alternative "sliding scale" test. *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). However, the Ninth Circuit overruled this standard in keeping with the Supreme Court's decision in *Winter*. *American Trucking Ass'ns Inc. v. City of Los. Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (holding that "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable"). Additionally, the *Winter* standard requires the plaintiff to demonstrate that irreparable harm is real, imminent and significant– not merely speculative or potential– with admissible evidence and a clear likelihood of success. 129 S.Ct. at 374. Harm is irreparable when it cannot be remedied except through injunctive relief. *Designer Skin, LLC v. S & L Vitamins, Inc.* 2008 WL 4174882, at *5 (D. Ariz. 2008).

## III.   DISCUSSION

Plaintiff seeks a preliminary injunction of the Trustee sale of his house pending his complaint against Defendant for Breach of Contract, Bad Faith Breach of Contract, Negligent Infliction of Emotional Anguish and Intentional Infliction of Emotional Anguish. As stated above, to obtain preliminary injunctive relief, Plaintiff must show "a likelihood of success on the merits. . ." *Winter*, 129 S.Ct. at 376. The Court finds that Plaintiff has failed to show a likelihood of success on any of his claims against Defendant.

### A.   Breach of Contract

Plaintiff alleges that Defendant breached the contract contained in the Borrowers' Protection Plan. Doc. #22 at 5. Plaintiff claims that the Plan's disability protection should have covered the principal and interest payments from the time Plaintiff was rendered disabled until the present. *Id.* To achieve this result, Plaintiff argues various reasons why the express limitations of the Plan should not be enforced against him. Plaintiff concludes that Defendant breached the Plan when Defendant did not cover these payments and instead scheduled a Trustee sale. *Id.* at 5-6. For the following reasons, the Court finds that the

Plaintiff has not shown "a likelihood of success" on the merits on his breach of contract claim. *See Winter*, 129 S.Ct. at 376.

### 1.    Whether Plaintiff Received the Whole Contract

Plaintiff first argues that he received only a two page Addendum and not the whole contract; therefore he never saw any of the eligibility requirements or the language expressly limiting Defendant's duty to cover loan payments to twelve months.[3] Doc. #57 at 9. The Court finds it unlikely that Defendant supplied Plaintiff with only the first two pages of the Addendum.

For an enforceable contract to exist, there must be a manifestation of mutual assent. *Johnson v. Earnhardt's Gilbert Dodge, Inc*., 212 Ariz. 381, 384 (2006) (citing Restatement (Second) of Contracts § 17(1) (1981)).    "Mutual assent is ascertained from objective evidence, not [from] the hidden intent of the parties." *Id.* (internal citations omitted).  Courts must attempt to "ascertain and give effect to the intention of the parties at the time the contract was made if at all possible," and in light of all the surrounding circumstances. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 153 (1993); Restatement (Second) Contracts § 202.

Plaintiff argues that he never received the eligibility requirements and contends he learned of them later from a different document, which Plaintiff calls the "Information Set." Doc. #57 at 9.    Plaintiff says Defendant never gave him the Information Set. *Id.*  Thus, Plaintiff argues that he could not have known about the eligibility requirements when he signed the contract. *Id.* at 11. The Court notes that the size and font of the page numbers and the footer are, in fact, different on pages one and two than the rest of the Addendum. *See* Doc. #60 at Exhibit 3.  This fact could support Plaintiff's assertion that the eligibility

---

[3]Plaintiff has offered no admissible evidence as to what part of the Plan he received; this argument is made only by Plaintiff's counsel.  No affidavits or testimony were offered at the June 18 Preliminary Injunction hearing to support these allegations.  However, the Court will entertain counsel's arguments in light of the uncontested fact that Plaintiff is disabled and that his disability may have prevented him from testifying or offering an affidavit. *See* Doc. #22 at ¶13.

requirements appeared on a separate document.

Defendant argues that there cannot have been a breach of contract because the contract consisted of nine pages, the fourth page of which contained the eligibility requirements. Doc. #60 at 4. Each page, including the two pages Plaintiff signed, was labeled "Page [X] of 9." *See id.* at Exhibit C. This is evidence that the contract was actually a nine page document. Furthermore, page one of the Addendum states "You may find a complete explanation of eligibility requirements, conditions and exclusions *in the following portions* of the Borrowers Protection Plan. The undersigned Borrowers acknowledge the receipt of the above product disclosures." Doc. #60 at Exhibit C (emphasis added). Plaintiff signed this page. *Id.* The Addendum also states on page two of nine, ". . . having full opportunity to read the Addendum and ask questions, I/we make the following choice. . ." *Id.* Plaintiff also signed this page. *Id.* These portions suggest that the eligibility requirements appeared later in the same document that Plaintiff signed, or at least were provided to Plaintiff at the time of signing. Plaintiff has shown an objective "manifestation of mutual assent" by signing pages one and two of the Addendum. *See Johnson*, 212 Ariz. at 384. Thus, in light of the surrounding circumstances, *see Taylor*, 175 Ariz. at 153, Plaintiff will likely be found to have agreed to the eligibility requirements on page four. Since the Court has not seen any admissible evidence to the contrary, the Court finds it likely that the Plan consisted of nine pages, all of which were supplied to Plaintiff at the time of signing.

## 2.     Ambiguity of the Eligibility Requirements

Plaintiff next argues that one of the eligibility requirements is ambiguous: specifically, the clause requiring policyholders to be employed full-time for three months before seeking disability benefits. Doc. #57 at 15. When interpreting a contract, courts must attempt to "ascertain and give effect to the intention of the parties at the time the contract was made if at all possible," and in light of all the surrounding circumstances. *Taylor*, 175 Ariz. at 153; Restatement (Second) Contracts § 202. Additionally, courts must "look at the agreement as a whole, reading each part in light of all other parts." *MT Builders L.L.C. v. Fisher Roofing, Inc.*, 219 Ariz. at 305 (App. 2008). However, "[a] contract is not ambiguous just because the

parties to it . . . disagree about its meaning." *In re Estate of Lamparella*, 210 Ariz. 246, 250 (App. 2005).

The eligibility requirement that Plaintiff claims is ambiguous states:

WHO IS ELIGIBLE FOR DISABILITY PROTECTION? To be eligible for disability protection, I must have worked at least thirty (30) hours per week, for wages or profit, on a continuous basis during the three-month period immediately preceding the date of my Disability.

Doc. #60 at Exhibit 3, p. 4. Plaintiff claims he is eligible for disability protection because he worked full-time from November 2006 until January 13, 2008. Doc. #57 at 15. Therefore, even though Plaintiff did not work on a continuous basis up to February 2, 2008, the date of his disability, he exceeded the minimum number of total hours that the Plan requires.[4] Plaintiff argues that this amount of work should satisfy the eligibility requirement because the Plan called for 30 hours per week *during* the three month period. *Id.*

However, in light of the other provisions of the Plan and the surrounding circumstances, the Court need not determine whether this eligibility requirement is unambiguous. *See Taylor*, 175 Ariz. at 153. Immediately below the clause that Plaintiff claims is ambiguous, the Plan reads, "[i]f I retire or become unemployed after the Note Date, I will no longer be eligible for Disability Protection." Doc. #60 at Exhibit 3, p. 4. Plaintiff has effectively conceded that he was unemployed by claiming and receiving twelve months of unemployment benefits under the Plan. Doc. #60 at Exhibit D, p. 4. Plaintiff cannot not argue that he was employed directly preceding his disability. Thus, this Court will not reach the issue of whether this eligibility requirement was ambiguous. Since the Court finds Plaintiff was unemployed during the three months preceding his disability, he is not eligible to receive disability benefits under the terms of the Plan. Therefore, Plaintiff has not shown a "likelihood of success" on the claim that Defendant breached the Plan. *See Winter*, 129

---

[4]Plaintiff claims to have worked 462 hours over the three month period preceding his disability. Doc. #64 at 2. The Plan requires policyholders to have worked 30 hours per week, or 366 hours, over the three month period. Therefore, Plaintiff exceeded the minimum number of hours that the Plan required over the three month period preceding to claim coverage for disability.

1  S.Ct. at 376.

2  **3.  Ambiguity of the Duration of the Plan**

3  Alternatively, this Court finds that Defendant has not breached the Plan because

4  coverage under the Plan is limited to twelve months, which Plaintiff exhausted by receiving

5  twelve months of unemployment benefits. *See* Doc. #60 at Exhibit C, Exhibit D.

6  Plaintiff argues that the Plan should have covered his loan payments for 120 months,

7  not twelve months. Doc. #63 at 3-4. Plaintiff points to the provision on page one of the Plan

8  reading, "The [Plan] will automatically terminate in the following circumstances:. . . 5. The

9  expiration date (final scheduled payment due date) of your loan is reached, or 120 months

10  of protection, whichever comes first." Doc. #60 at Exhibit C. On page two, the Plan reads,

11  "protection will expire on July 1, 2016." *Id.* Plaintiff contends that these provisions could

12  refer to the maximum number of months that the Defendant agreed to cover Plaintiff's loan

13  payments in the event of disability or unemployment. In light of the rest of the Plan,

14  however, the Court finds no ambiguity in the length of the Plan's coverage. *See MT*

15  *Builders*, 219 Ariz. at 305 (courts must "look at the agreement as a whole").[5]

16  The provisions that Plaintiff argues are ambiguous refer to times when the Plan will

17  no longer cover any disability or unemployment claims. They do not refer to the maximum

18  number of months that Defendant will pay a valid claim. The maximum number of months

19  Defendant will pay a valid claim is first stated on page two of the Plan, which reads "12

20  MONTH SINGLE DISABILITY, INVOLUNTARY UNEMPLOYMENT, ACCIDENTAL

21  DEATH." Doc. #60 at Exhibit C. This maximum number of months Defendant will pay a

22  valid claim is explained in more detail on pages five and seven. *Id.* The 120 month figure

23

24  [5]Plaintiff also argues that the differences between the Loan #1 Plan and the Loan #2

25  Plan create ambiguity as to the duration of coverage. However, when interpreting a contract,

Courts must "ascertain and give effect to the intention of the parties *at the time the contract*

26  *was made*." *Taylor*, 175 Ariz. at 153 (emphasis added). Since Plaintiff could not have

27  known about the terms of the Loan #2 Plan at the time he entered the Loan #1 Plan, the Court

need not consider whether the terms of the Loan #2 plan create ambiguity in the Loan #1

28  Plan.

refers to the amount of time after which "the [Plan] will automatically terminate," thus not even covering valid claims. *See id.* Since Plaintiff became unemployed before July 1, 2016, the Plan covered the maximum twelve months of Plaintiff's loan payments. *Id.* at Exhibit D. Had Plaintiff become unemployed or disable after July 1, 2016, the Plan would not have covered him even if he had paid all his premiums. This has no relation to the number of months that the Plan would cover loan payments for a valid claim. Furthermore, reading the 120 month figure as Plaintiff does would render meaningless the three distinct warnings in the Plan that coverage was limited to twelve months. *See id.* at Exhibit C, p. 2, 5, 7. Plaintiff therefore fails to "read[] each part in light of all other parts." *MT Builders*, 219 Ariz. at 305. Thus, the Court finds that Plaintiff has not shown a likelihood of success on his claim that the Plan covered 120 months of loan payments for disability.

### 4. Unenforceable Contract of Adhesion

Plaintiff argues that the twelve month limit on benefits and eligibility requirements are unenforceable because the Plan was a contract of adhesion. Doc. #57 at 16. The Court finds that, although the Plan was a contract of adhesion, it will likely be found fully enforceable.

The complex nature of insurance policies, the lack of true negotiation and the difficulty that lay persons often have in understanding a policy's terms have led the courts to evaluate when the strict language of the policy should not be enforced. *See e.g. Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 394 (Ariz. 1984). Historically, Arizona courts looked only to the clarity of the policy language. If the policy language was unclear, it was interpreted against the insurance company. *See Coconino Co. v. Fund Adminstrs. Assn.*, 149 Ariz. 427, 431 (App. 1986). If the meaning and intent of the policy was clear, however, the courts were not permitted to create ambiguity in order to rule in favor of the insured. *Schwab v. State Farm Fire & Cas. Co.*, 27 Ariz. App. 747, 751 (1976). However, the courts came to recognize that even unambiguous policy language could be confusing to a lay person who did not have the occasion to negotiate detailed contracts. Thus, the Arizona Supreme Court ruled that even unambiguous policy language

would not be enforced against the insured if the insured had a reasonable expectation of coverage. *Darner Motor Sales,* 140 Ariz. at 394.

Three years later, the Arizona Supreme Court granted review in *Gordinier v. Aetna Cas. & Surety Co.*, 154 Ariz. 266 (1987), in order to clarify the meaning of *Darner*. The Supreme Court gave a "synthesis of the cases and authorities [to] demonstrate[] [that] Arizona courts will not enforce even unambiguous boilerplate terms in standardized insurance contracts in a *limited* variety of situations:

> 1.    Where the contract terms, although not ambiguous to the court, cannot be understood by the reasonably intelligent consumer who might check on his or her rights, the court will interpret them in light of the objective, reasonable expectations of the average insured;
>
> 2.    Where the insured did not receive full and adequate notice of the term in question, and the provision is either unusual or unexpected, or one that emasculates apparent coverage;
>
> 3.    Where some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of a reasonable insured;
>
> 4.    Where some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously denied by the policy.

*Gordinier*, 154 Ariz. at 272-273 (emphasis in original) (internal citations omitted).

Here, the Plan can fairly be called a contract of adhesion.[6]  The Plan was an optional, take-it-or-leave-it offer of insurance. *See* Doc. #60 at Exhibit C.  The terms were not individually negotiated by the parties. *See* Doc. #57 at 16.  Therefore, the Court must determine whether the Plan falls within one of the limited situations enunciated by *Gordinier*

---

[6]Defendant contends that the Plan is not a contract of adhesion, citing *McAlister v. Citibank*, 171 Ariz. 207, 213 (App. 1992).  That case holds that promissory notes are not contracts of adhesion as a matter of law. *Id.*  Here, the agreement in question is an insurance agreement regarding payment on the promissory note.  This Court has already determined that, even if Defendant is merely a lender with respect to the loan, Defendant created an insurer/insured relationship with respect to the Plan.  Doc. #56 at 4.  Therefore, *McAlister* is inapposite.  The Court does note that Defendant has moved to reconsider whether it is an insurer.  However, the Court need not address that motion for purposes of this Order.

where contracts of adhesion are unenforceable.  154 Ariz. at 272-273.

Plaintiff first argues that the eligibility requirements should be interpreted to comport with reasonable consumer expectations.  Doc. #57 at 16.  However, for a court to do this, it must first find that the "contract terms. . . cannot be understood by the reasonably intelligent consumer."[7]  *Gordinier*, 154 Ariz. at 273.  In *Vencor Inc. v. National States Ins. Co.*, the Ninth Circuit discussed two factors in deciding if a reasonably intelligent consumer could understand the terms of a contract: whether the wording of the contract was arcane or technical; and whether the pertinent provision was in a location where the consumer would expect it to be.  303 F.3d 1024, 1037-1038 (9th Cir. 2002) (applying Arizona law).

Here, the Court finds the language of the Plan can be understood by the reasonably intelligent consumer.  The Plan is free of arcane and technical language.  See Doc. #60 at Exhibit C.  Furthermore, the eligibility requirements appear exactly where a reasonably intelligent consumer would look to find them: under the heading "II. DISABILITY PROTECTION" and the subheading "b) WHO IS ELIGIBLE FOR DISABILITY PROTECTION?."  *Id.* at Exhibit C, p. 4.  The limitation of coverage to twelve months appears in all caps on page two and is underlined on pages five and seven.  *Id.* at p. 2, 5, 7.  Additionally, the Plan is only nine pages long, so consumers would not need to search extensively to find the information.  *Id.*  Therefore, the Plan can be understood by a reasonable consumer.

Courts may also find unambiguous contracts unenforceable where "the insured did not receive full and adequate notice of the term in question, and the provision. . . emasculates apparent coverage."[8]  *Gordinier*, 154 Ariz. at 283.  The Court has already found it likely that Plaintiff received the eligibility requirements when he signed the Addendum.  Plaintiff could

---

[7]This is the first situation outlined by *Gordinier* whereby courts may strike down unambiguous insurance terms.  154 Ariz. at 273.

[8]This is the second situation outlined by *Gordinier* whereby courts may strike down unambiguous insurance terms.  154 Ariz. at 273.

still argue that such important terms as the eligibility requirements should have been orally brought to Plaintiff's attention, or perhaps bolded in the text. However, in light of the short length of the Plan, its clarity, and the sufficiency of its headings, this Court will not impose a duty on Defendant to draw extra attention to the eligibility requirements.

Furthermore, the Court notes that, even though the eligibility requirements were not individually highlighted, they did not actually "emasculate[] apparent coverage." *Gordinier*, 154 Ariz. at 273. The Plan stated in three places that the maximum amount of coverage under the Plan was twelve months, including once on a page that Plaintiff signed. *See* Doc. #60 at Exhibit C. Plaintiff received twelve months coverage for his unemployment starting in January 2008 and running until January 2009. *Id.* at Exhibit D. Plaintiff was disabled in February 2008, only three weeks after he became unemployed. Doc. #22 at ¶13. If Plaintiff were to receive the maximum amount of disability coverage starting in February 2008, it would only run for twelve months until February 2009, largely overlapping the coverage Plaintiff did receive for unemployment. Therefore, even if the Court found he could collect both under the disability and unemployment sections of the Plan,[9] the only coverage Defendant denied him was from January to February of 2009. The Court finds that lack of coverage for one month cannot be fairly characterized as "emasculat[ing] apparent coverage." *See Gordinier*, 154 Ariz. at 273. Therefore, Plaintiff received adequate notice of the terms and the terms did not emasculate apparent coverage.

Plaintiff goes on to argue that the twelve month limitation on coverage does not meet a reasonable consumer's expectations. Doc. #63 at 4. Plaintiff notes that the maximum amount of fees a policyholder could pay under the Plan is $9,666.00 but the maximum amount of loan payments the Defendant would cover is $11,719.44 if the Plan were limited

---

[9]It is not apparent to the Court that Plaintiff can collect 12 months of disability and 12 months of unemployment coverage under the Plan. One requirement for receiving disability is that the policyholder not be unemployed. Doc. #60 at Exhibit C. Yet, one requirement for receiving unemployment is that the policyholder not be unemployed due to disability. *Id.* Thus, the Plan seems to create a situation where policyholders can recover a maximum of 12 months coverage under disability *or* unemployment, not both.

to twelve months of coverage.[10]   However, this argument overlooks the fact that most policyholders who make claims under the Plan will become disabled or unemployed sometime before the 120 months expire.  Policyholders who become disabled or unemployed before the 120 months expire and receive the maximum twelve months of coverage conceivably do not have to continue paying the monthly fee for the Plan since they will have exhausted their twelve months of coverage.  Additionally, Plaintiff has presented no evidence that the Plan is "unusual" as compared to other insurance agreements.  *See Gordinier*, 154 Ariz. at 273.   Thus, again Plaintiff has not shown a likelihood of success on his claim that he should receive 120 months of coverage.

Finally, Plaintiff argues that the language in the Loan #2 Plan caused both an objective and subjective impression that the Loan #1 Plan would cover 120 months, not twelve months, of loan payments if the policyholder became disabled.[11]  *Gordinier*, 154 Ariz. at 273.   Plaintiff argues that the Loan #2 Plan never mentions the twelve month coverage and instead suggests that policyholders will be covered for 120 months in the event of a disability.  Plaintiff points to the fact that the twelve month figure does not appear on the first two pages of the Loan #2 Plan like it does on the Loan #1 Plan.  *See* Doc. #60 at Exhibit C; Doc. #57 at Exhibit 3.  Furthermore, the Loan #2 Plan contains a box that states "Benefit Period: 120."  Doc. #57 at Exhibit 3.   Plaintiff argues that neither he nor a reasonable consumer would expect two disability insurance policies by the same insurer, for loans on the same house, taken out within a month of one another, with similar premiums and with similar boilerplate language to have such a drastic difference in the length of coverage.

To show that the Loan #1 Plan is an unenforceable contract under *Gordinier*, Plaintiff

---

[10]$11,719.44 represents Plaintiff's monthly loan payments of $976.62 times twelve months of coverage.

[11]The third situation outlined in *Gordinier* deals with an action attributable to Defendant causing an objective impression of coverage.  154 Ariz. at 273.  The fourth situation deals with an action attributable to Defendant causing an subjective impression of coverage.  *Id.*

must argue that the language in Loan #2 caused him, or would cause a reasonable consumer, to form an impression of the Loan #1 Plan's coverage. *See Gordinier*, 154 Ariz. at 273. Here, Plaintiff cannot prevail. Courts interpret contracts based on "the intention of the parties *at the time the contract was made*." *Taylor*, 175 Ariz. at 153 (emphasis added). Since Plaintiff agreed to the Loan #2 Plan one month after he agreed to the Loan #1 Plan, it is not logical that the language of the later Plan could have informed his beliefs about the earlier Plan. There is no evidence suggesting Plaintiff knew the language in the Loan #2 Plan before he agreed to the Loan #1 Plan. Likewise, no reasonable consumer could form an impression about one insurance policy based on a policy they would not yet read or agree to until a future time. As such, Plaintiff has not shown that the language in the Loan #2 Plan caused both an objective or subjective impression that the Loan #1 Plan would cover 120 months, not twelve months, of loan payments for a disability.

Therefore, Plaintiff has not shown a "likelihood of success" on the claim that the eligibility requirements or the twelve month cap on coverage in the Plan create an unenforceable contract of adhesion. *See Winter*, 129 S.Ct. at 376.

### 5. Unconscionability

Plaintiff also argues that the eligibility requirements in the Plan are unenforceable because they are unconscionable. Doc. #57 at 19. "Courts may refuse to enforce a term within a party's reasonable expectations if that term is unconscionable." *Banner Health v. Med. Sav. Ins., Co.*, 216 Ariz. 146, 159 (App. 2007). The determination of whether a contract is unconscionable is for the trial court to decide as a matter of law. *Maxwell v. Fidelity Financial Services, Inc.*, 184 Ariz. 82, 87 (1995). "A contract may be procedurally unconscionable and/or substantively unconscionable." *Cooper v. QC Fin. Services*, 503 F. Supp. 2d 1266, 1278 (D. Ariz. 2007) (citing *Maxwell*, 184 Ariz. at 89-90). However, if only procedural unconscionability is present, "it may be more appropriate to analyze the claims under the doctrines of fraud, misrepresentation, duress, and mistake." *Maxwell*, 184 Ariz. at 91; *see also S.W. Pet Products, Inc. v. Koch Indus*. 107 F. Supp. 2d 1108, 1113 (D. Ariz. 2000). The Court has three options in the event it determines that a clause of a contract is

unconscionable as a matter of law. *See* Arizona Revised Statute § 47-2302(A). The Court may: (1) refuse to enforce the contract; (2) enforce the remainder of the contract without the unconscionable clause; or (3) limit the application of the unconscionable clause as to avoid any unconscionable result. *Id.*

Procedural unconscionability "is concerned with 'unfair surprise,' fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should." *Maxwell*, 184 Ariz. at 89-90. "Under the procedural rubric, courts examine factors influencing the bargaining process: 'the real and voluntary meeting of the minds of the contracting party: age, education, intelligence, business acumen and experience, relative bargaining power ... [and] whether there were alternative sources of supply of the goods in question.'" *S.W. Pet Products, Inc.,* 107 F. Supp. 2d at 1113 (quoting *Maxwell*, 184 Ariz. at 89-90). Substantive unconscionability looks at "the actual terms of the contract and examines the relative fairness of the obligations assumed." *Maxwell*, 184 Ariz. at 89 (citation omitted). Substantive unconscionability occurs when there are "contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." *Maxwell*, 184 Ariz. at 89 (citation omitted).

Here, Plaintiff has alleged some aspects of procedural unconscionability. Plaintiff's attorney describes Plaintiff as "a person of limited education" and says Plaintiff possesses little business acumen or experience. Doc. #57 at 19. As noted above, this was a contract of adhesion where Defendant had all the bargaining power. However, Plaintiff could have sought alternative sources of disability insurance. *See Southwest Pet Products*, 107 F. Supp. 2d at 1113. Furthermore, Plaintiff has provided little evidence of fraud, duress, misrepresentation or mistake. *See Maxwell*, 184 Ariz. at 91. Plaintiff has not alleged fraud, nor does fraud appear to exist where Defendant has already covered Plaintiff's loan payments for twelve months due to his unemployment. Doc. #60, Exhibit D at 22. The Plan was clearly labeled as optional, which belies any notion of duress. Doc. #22 at ¶9. Misrepresentation could exist if Defendant failed to provide Plaintiff with notice of the

eligibility requirements or told Plaintiff something that contradicted the written plan. However, the Court has already determined that Defendant likely provided Plaintiff with the eligibility requirements. Plaintiff has not alleged that Defendant told him anything that contradicted the written Plan. Finally, as explained below, the doctrine of mistake does not apply where only one party is mistaken about a fact. Therefore, Plaintiff has not provided any evidence showing why his relative lack of bargaining power and expertise resulted in unfair surprise. *See Maxwell*, 184 Ariz. at 89; *see also Earl v. Wachovia Motgage FSB*, 2010 WL 2336191 *5 (D. Ariz. 2010) ("The mere fact that Plaintiff entered into a contract with a financially sophisticated bank is not, in and of itself, enough to find procedural unconscionability. Plaintiff needs to bring forth specific facts. . . identifying specific aspects of the contract negotiation that might render the contract unconscionable."). As such, Plaintiff has not shown a "likelihood of success" on the claim of procedural unconscionability. *See Winter*, 129 S.Ct. at 376. .

Next, Plaintiff makes two arguments why the Plan is substantively unconscionable. First, Plaintiff argues that it is substantively unfair that the Plan can strip him of disability coverage because he became unemployed three weeks before he became disabled. Upon review of the Plan in its entirety, the Court disagrees. The Plan covered both disability and unemployment. Doc. #60 at Exhibit C. The disability insurance excluded potential policyholders who became unemployed before they were disabled. *Id.* Conversely, the unemployment insurance excluded potential policyholders who became unemployed only because of their disability. *Id.* These clauses are not "so one-sided as to oppress or unfairly surprise" potential policyholders of coverage. *See Maxwell*, 184 Ariz. at 89. Rather, they cover twelve months of loan payments for disability *or* unemployment, just not both. Here, Defendant already covered Plaintiff's loan payments for the maximum twelve months under the unemployment policy. Doc. #60 at Exhibit D.

Second, Plaintiff argues that the twelve month cap on coverage is substantively unconscionable. However, the Court is aware of no authority that suggests private insurers may not limit the number of months for which they are liable to cover policyholders. *See e.g.*

1    *Brown v. Campbell Co. Bd. of Ed.*, 915 S.W.2d 407, 415 (Tenn. 1995) (finding statutory caps

2    on amount of months that permanently injured workers could recover to be constitutional).

3    It is conceivable that an insurance agreement with an excessively low cap on the number of

4    months and excessively high premiums could be unconscionable. However, Plaintiff has

5    not presented any evidence that his premiums were excessively high or that the twelve month

6    cap is excessively low in comparison. As noted above, the mere fact that a policyholder

7    could pay $9,666.00 in premiums for coverage of $11,719.44 is not in itself unreasonable

8    because policyholders would likely exhaust their $11,719.44 of coverage before paying

9    $9,666.00 in fees. Moreover, Plaintiff has not cited, nor has the Court located, any authority

10   requiring the maximum potential benefits to exceed the maximum potential premiums by a

11   particular percentage to avoid substantive unconscionability. Thus, this Court has no basis

12   to find "an overall imbalance in the obligations and rights imposed by the bargain, and

13   significant cost-price disparity." *Maxwell*, 184 Ariz. at 89 (citation omitted). Therefore,

14   Plaintiff has not shown a "likelihood of success" on the claim that the Plan is

15   unconscionable. *See Winter*, 129 S.Ct. at 376.

16                 **6. Mutual Mistake**

17       Plaintiff argues that the Plan should be equitably reformed due to mutual mistake.

18   Doc. #57 at 19. However, "[a] contract may be rescinded on the ground of a mutual mistake

19   as to a basic assumption on which *both parties* made the contract." *Nelson v. Rice*, 198 Ariz.

20   563, 566 (App. 2000) (emphasis added, internal citations omitted). "It is not within the

21   power of this court to revise, modify, alter, extend, or remake a contract to include terms not

22   agreed upon by the parties." *Issak v. Mass. Indem. Life Ins. Co.*, 127 Ariz. 581, 584 (1981)

23   (internal citations omitted). Here, there is no suggestion that Defendant was ever mistaken

24   about the terms in the Plan. Therefore, the doctrine of mutual mistake does not apply.

25               **7. Equitable Reformation**

26       Plaintiff suggests that this Court could equitably reform the Plan to remove the

27   eligibility requirements and twelve month cap, thus covering Plaintiff under the Plan. Doc.

28   #57 at 19. The Court could refuse to enforce these clauses if they were found

unconscionable. *See* Arizona Revised Statute § 47-2302(A). Since the Court has previously found the eligibility requirements and twelve month cap are not likely unconscionable, Plaintiff will not receive this relief.

## B. Bad Faith Breach of Contract

Plaintiff next argues that Defendant breached the Plan in bad faith. The Court finds that Plaintiff has not shown "a likelihood of success on the merits" on this claim. *See Winter*, 129 S.Ct. at 376. Additionally, a preliminary injunction is inappropriate where Plaintiff's injury could be equally remedied by economic damages. *See Designer Skin, LLC*, 2008 WL 4174882, at *5.

Under Arizona law, for a plaintiff to show that an insurance company acted in bad faith plaintiff must show the absence of a reasonable basis for denying benefits and that the insurer either knew or recklessly disregarded the fact that it did not have a reasonable basis for denying benefits.[12] *Noble v. National Am. Life Ins. Co.*, 128 Ariz. 188, 190 (1981). However, "[m]ere negligence or inadvertence is not sufficient--the insurer must intend the act or omission and must form that intent without reasonable or fairly debatable grounds." *Rawlings v. Apodaca*, 151 Ariz. 149, 161 (1986). In determining whether the insurance company acted reasonably in a case premised on failure to pay benefits, the Court considers whether the insurer's liability under the policy was "fairly debatable." *See Deese v. State Farm Mut. Auto. Ins. Co.*, 172 Ariz. 504, 507 (1992). If there is a question of fact as to whether the insurance company owed benefits under the policy, then the claim is fairly debatable. *Lasma Corp. v. Monarch Ins. Co.*, 764 P.2d 1118, 1122 (Ariz. 1988). When a claim is fairly debatable, the insurance company cannot be liable for acting in bad faith by declining to pay such claim immediately. *See id.*

---

[12]Defendant again suggests that the contract in controversy is the underlying loan agreement, not an insurance agreement. However, the contract in controversy is the insurance agreement on the payment of that promissory note. Therefore, Defendant is an insurer with regards to the Plan, *see* Doc. #56 at 4, and laws regarding insurance coverage apply. Although Defendant has moved to reconsider this determination, the Court will not resolve this issue for purposes of this Order.

The Court has already found that Plaintiff is unlikely to prevail on his breach of contract claim. It follows that Plaintiff is equally unlikely to succeed on this claim. Here, a question existed as to whether Plaintiff qualified for disability benefits because of his unemployment. *See* Doc. #60 at 7; Doc. #57 at 14. Any question of fact, however, establishes that the claim is fairly debatable. *Lasma Corp*, 764 P.2d 1118, 1122. Therefore, Plaintiff has not shown "a likelihood of success" on his bad faith breach of contract claim. *See Winter*, 129 S.Ct. at 376.

Moreover, Plaintiff has not shown why the tort of bad faith breach of insurance contract is not remediable by money damages. The *Winter* standard requires the plaintiff to demonstrate that irreparable harm is real, imminent and significant– not merely speculative or potential– with admissible evidence and a clear likelihood of success. 129 S.Ct. at 374. Harm is irreparable when it cannot be remedied except through injunctive relief. *Designer Skin, LLC,* 2008 WL 4174882, at *5. Economic damages are not traditionally considered irreparable because the injury can later be remedied by a monetary award. *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (holding that "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury. . . The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm")).

Here, Plaintiff claims that Defendant failed to answer multiple phone calls and letters. Doc. #22 at 9. Plaintiff has alleged that Defendant's lack of correspondence "put [him] in fear of losing the home, creating anxiety and panic of months duration." Doc. #22 at 7. Plaintiff concludes that this Court must issue an injunction to stop the Trustee sale, which will cause him irreparable harm. *Id.*; Doc. #57 at 1. However, this Court has now found it unlikely that Defendant breached the Plan by failing to cover Plaintiff's loan payments and ultimately scheduling a Trustee sale. Any separate claim of bad faith cannot remedy the alleged injury caused by the Trustee sale itself, but only Defendant's failure to return Plaintiff's phone calls and letters. Thus, the alleged injury from Defendant's failure to

communicate has already occurred and can no longer be remedied by injunction where the Court has found Defendant is likely within its legal right to hold a Trustee sale on the house. *See Designer Skin, LLC* , 2008 WL 4174882, at *5. Therefore, Plaintiff has not shown that any harm he suffered from Defendant's failure to communicate with him can be "remedied except through injunctive relief." *Id.*

### C. Negligent Infliction of Emotional Distress

This Court has previously denied Defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(6) with regards to Plaintiff's claim of Negligent Infliction of Mental Anguish. Doc. #56 at 6-7. This Court found that Plaintiff's claim satisfied the Rule 8(a)(2) requirement of "notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Now, Plaintiff must clear a larger hurdle: whether the claim has a "likelihood of success on the merits." *Winter*, 129 S.Ct. at 376. The Court finds that plaintiff has not shown a "likelihood of success on the merits." *See id.* Additionally, the Court finds a preliminary injunction to be inappropriate where Plaintiff's injury could be equally remedied by economic damages. *See Designer Skin, LLC* , 2008 WL 4174882, at *5.

Arizona law recognizes two types of negligent infliction of emotional distress. The first type "requires plaintiff to: (1) witness an injury to a closely related person, (2) suffer mental anguish manifested as physical injury, and (3) be within the zone of danger so as to be subject to an unreasonable risk of bodily harm created by the defendant." *Pierce v. Casas Adobes Baptist Bhurch*, 162 Ariz. 269, 272 (1989) (en banc).

The second type of claim for negligent infliction of emotional distress arises when the distress results from an injury to the claimant themself. *See Monaco v. HealthPartners of S. Ariz.*, 196 Ariz. 299, 302-303 (App. 1999) (holding negligent injection of radioactive material into plaintiff was sufficient to support a claim for negligent infliction of emotional distress). To sustain this type of negligent infliction of emotional distress claim, a plaintiff must show:

> (a) [the tortfeasor] should have realized that his conduct involved an

> unreasonable risk of causing the distress . . . , and (b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm.

Restatement (Second) of Torts, §§ 313 (adopted by *Ball v. Prentice,* 162 Ariz. 150, 152 (App. 1989)). Furthermore, "the Arizona cases and Restatement § 436A make clear that a physical injury, as well as a long-term physical illness or mental disturbance, constitutes sufficient bodily harm to support a claim of negligent infliction of emotional distress." *Monaco*, 196 Ariz. at 303.

Here, Plaintiff cannot recover under the first test because he was not in "the zone of danger so as to be subject to an unreasonable risk of bodily harm created by the defendant." *See Pierce*, 162 Ariz. at 272. Plaintiff could argue that he falls under the second type of negligent infliction of emotional distress because the distress resulted from an injury to himself. *See Monaco*, 196 Ariz. at 302-303. However, this test requires an "*unreasonable risk of causing distress.*" Restatement (Second) of Torts, §§ 313 (emphasis added). The Court is aware of no authority finding lenders seeking to foreclose of homes in default to be acting unreasonably. This is distinguishable from *Monaco* where a doctor's mistaken injection was found unreasonable. *Monaco*, 196 Ariz. at 301. There, the doctor had no reason to inject the patient with a dangerous substance; he did so only through inadvertence. *Id.* Here, Defendant did not mistakenly schedule a Trustee sale of Plaintiff's house. Rather, Defendant scheduled the Trustee sale because Plaintiff was in default on Loan #1. Doc. #57 at Exhibit 1. Therefore, even though the anticipated Trustee sale has likely caused Plaintiff distress, Defendant did not act unreasonably in pursuing the Trustee sale. As a result, Plaintiff has not shown "a likelihood of success" on his negligent infliction of emotional distress claim. *See Winter*, 129 S.Ct. at 376.

Moreover, Plaintiff has not shown why the tort of negligent infliction of emotional distress is not remediable by money damages. *See Winter*, 129 S.Ct. at 374 (plaintiff must demonstrate that irreparable harm is real, imminent and significant– not merely speculative or potential– with admissible evidence and a clear likelihood of success to receive a preliminary injunction). The Court has already found it unlikely that Defendant breached the

Plan by failing to cover Plaintiff's loan payments and ultimately scheduling a Trustee sale. Therefore, as with Plaintiff's claim of bad faith above, any separate claim of negligent infliction of emotional distress cannot remedy the alleged injury caused by the Trustee sale itself. The injury is therefore Defendant's allegedly negligent failure to communicate with Plaintiff. *See* Doc. #22 at 7. This injury has already occurred and can no longer be remedied by injunction. *See Designer Skin, LLC*, 2008 WL 4174882, at \*5. Therefore, Plaintiff has not shown that any harm he suffered from Defendant's failure to communicate with him can be "remedied except through injunctive relief." *Id.*

### D. Intentional Infliction of Emotional Distress

As with Plaintiff's negligent infliction of emotional distress claim, this Court has previously denied Defendant's motion to dismiss with regards to intentional infliction of emotional distress. Doc. #56 at 7-8. Now, Plaintiff must show that the claim has a "likelihood of success on the merits." *Winter*, 129 S.Ct. at 376. The Court finds that plaintiff has not shown a likelihood of success on the merits with regards to his intentional infliction of emotional distress claim.

To prove a claim of intentional infliction of emotional distress under Arizona law, Plaintiff must show that: 1) Defendant engaged in extreme and outrageous conduct; 2) Defendant either intended to cause emotional distress or recklessly disregarded the near certainty that emotional distress would result from the conduct; and 3) Plaintiff actually suffered emotional distress because of Defendant's conduct. *See Nelson v. Phoenix Resort Corp.*, 181 Ariz. 188, 199 (App. 1994). In determining whether Defendant's conduct was extreme and outrageous, courts have found that the conduct must be "extraordinary." *See Tempesta v. Motorola, Inc.*, 92 F.Supp 2d 973, 986-97 (D. Ariz. 1999). The Arizona Court of Appeals elaborated on what constitutes extreme and outrageous conduct, holding that an act must be, "so outrageous in character and so extreme a degree, as to go beyond all possible bounds of decency, and. . . regarded as atrocious and utterly intolerable in a civilized community." *Mintz v. Bell Atl. Sys. Leasing, Int'l*, 183 Ariz. 550, 554 (App. 1995) (internal citations omitted).

In *Mintz*, an employee alleged intentional infliction of emotional distress against her former employer for encouraging her to come back to work while she was hospitalized for severe, work-related emotional problems. *Id.* at 552. The Arizona Court of Appeals found that the employer "had a legitimate business purpose in seeing that [the employee's] work was done, either by her or by someone else." *Id.* at 554. The Court found that the defendant should not be liable, "where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." *Id.* The Court therefore concluded that the employer's conduct was not extreme and outrageous. *Id.* at 555

Here, Defendant's conduct is also not extreme and outrageous. Defendant has a legitimate business interest in foreclosing on houses whose occupants fail to make their loan payments. If the insurance does not cover Plaintiff's loan payments, as discussed above, then Defendant has a legitimate interest in selling Plaintiff's house to repay the loan. This conduct does not transcend "all bounds of possible decency." *Id.* at 563. To the contrary, Defendant here has "done no more than to insist upon his legal rights in a permissible way," *id.* at 554, and is not likely to be subject to liability. This is especially true where both parties agreed contractually to this result. Thus, Plaintiff has not shown "a likelihood of success" on his claim for intentional infliction of emotional distress. *See Winter*, 129 S.Ct. at 376.

As with Plaintiff's other tort claims, Plaintiff has not shown why the tort of intentional infliction of emotional distress is not remediable by money damages. *See Winter*, 129 S.Ct. at 374 (plaintiff must demonstrate that irreparable harm is real, imminent and significant– not merely speculative or potential– with admissible evidence and a clear likelihood of success to receive a preliminary injunction). The separate claim of intentional infliction of emotional distress cannot remedy the injury caused by the Trustee sale itself. The harm from Defendant's alleged intentional failure to communicate with Plaintiff, *see* Doc. #22 at 7, has already occurred and can no longer be remedied by injunction where the Court has found Defendant likely within its legal right to hold a Trustee sale on the house. *See Designer Skin, LLC* , 2008 WL 4174882, at *5.

## IV.  CONCLUSION

The Court finds that Plaintiff has not shown a likelihood of success on the merits with regards to his claims for Breach of Contract, Bad Faith Breach of Contract, Negligent Infliction of Emotional Distress or Intentional Infliction of Emotional Distress.  As such, Plaintiff is not entitled to injunctive relief under *Winter*, 129 S.Ct. at 376, and this Court will deny Plaintiff's motion for preliminary injunction.

**Accordingly,**

**IT IS ORDERED** that Plaintiff Kevin Jones's First Amended Motion for Preliminary Injunction (Doc. #57) is **DENIED**.

DATED this 22nd day of June, 2010.

James A. Teilborg
United States District Judge